FLORENCE WOOLLEY ABRAHAMS *et al.* Appellants, *vs.* MARY E. SANDERS *et al.* Appellees.

*Opinion filed June 22, 1916—Rehearing denied October. 14, 1916.*

1. WILLS—*court not required to disregard circumstances surrounding testator.* While the intention to be ascertained is the one which the testator has expressed in his will, yet the court is not bound, in construing the instrument, to disregard the circumstances under which the will was made, but should endeavor to place itself, as nearly as possible, in the situation of the testator, in order to understand the language in the sense in which it was used.

2. SAME—*when devise will be construed as passing a base or determinable fee.* Where the testator gives a life estate to his wife in all of his real estate, (which was substantially all of his property,) gives a legacy of $1000 to each of his three daughters and devises the remainder of his property to his son, charging him with

the duty of paying the legacies within five years, a subsequent provision that "in the event any of my children herein named should die without definite issue and before this will takes effect, then their respective share or shares given under this will shall at once accrue to my surviving children," will be held to mean die without definite issue at any time and to give the son a base or determinable fee in the land, where to hold the contrary would give the estate to strangers in blood to the testator, (the son having died childless and devised his estate to his wife,) leaving the living children of the testator unprovided for, and where other parts of the will indicate that the testator meant the time of distribution when he referred to the taking effect of the will.

APPEAL from the Circuit Court of Bureau county; the Hon. SAMUEL C. STOUGH, Judge, presiding.

D. K. COCHRANE, and J. L. SPAULDING, (ALBERT M. KALES, of counsel,) for appellants.

BUSBY, WEBER & MILLER, GEORGE W. MILLER, and WATTS A. JOHNSON, for appellee Mary E. Sanders.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill for the partition of certain lands in Bureau county, filed in the circuit court of that county in April, 1915, by appellants against appellees. Besides answering the bill appellee Mary E. Sanders and her husband also filed a cross-bill. Both the bill and the cross-bill involved the construction of the will of William Woolley, deceased. After the pleadings were settled and a hearing had thereon the circuit court entered a decree that Mary E. Sanders was the owner in fee simple of the property described in said bill and cross-bill and was entitled to the relief prayed for in the cross-bill. This appeal followed.

William Woolley at the time of making the will in question, October 7, 1901, was past eighty-two years of age. He and his family had resided for years on the farm of about 250 acres sought to be partitioned and he was residing there at the time of his death. Both when the will was executed and at his death there were living his wife, Lu-

cinda; three daughters,—Florence Woolley Abrahams, Gertrude Woolley and Dora Woolley Coulter; and one son, Ernest A. Woolley. All the children were married at the time of their father's death except Gertrude. The two daughters were married previous to the making of the will; the son in 1903, after it was executed. The first clause of the will provided for the payment of just debts and funeral expenses. The third, fourth and fifth clauses gave to each of his three daughters a legacy of $1000. The other portions of the will necessary to be considered are:

"*Second*—I give, devise and bequeath unto my beloved wife, Lucinda Woolley, in lieu of her dower interest in my real estate and all other claims whatsoever, all the rents, issues and profits of my entire real estate for and during her natural life; and she shall from said rents, issues and profits pay all taxes and assessments which may accrue and keep the same properly repaired, but she shall not be required to account for any surplus of rents, issues and profits that may remain unexpended in her hand.

"*Sixth*—To my son, Ernest A. Woolley, I give, devise and bequeath all the rest, residue and remainder of my entire estate, of whatsoever kind or nature.

"*Seventh*—In the event that any of my children herein named should die without definite issue and before this will takes effect, then their respective share or shares given under this will shall at once accrue to my surviving children, share and share alike, the descendants of any such child or children taking *per stirpes*.

"*Eighth*—In the event that the death of my wife, Lucinda Woolley, should occur prior to my death, then my will shall take effect and my estate divided, distributed and settled in the same manner as it would have been divided, distributed and settled if her death had occurred subsequent to my decease.

"*Ninth*—I further direct that the legacies herein bequeathed to my daughters, Florence Woolley Abrahams,

Gertrude Woolley and Dora Woolley Coulter, shall be paid by my son, Ernest A. Woolley, my residuary legatee and devisee, and that he shall have five years after the death of my wife, Lucinda Woolley, should my death occur previous to hers, or the same limit of time after my death in the event her death occurs prior to mine, in which to pay the several legacies or sums of money herein mentioned as a gift or bequest to my three daughters; and in case my personal property should not be sufficient to pay the said several sums or legacies, then I further direct that they shall become a lien upon my real estate, and so much of my real estate as may be necessary be sold to pay any insufficiency due to each and every one of my daughters."

The daughter Florence and the son, Ernest, were made executors. The will was admitted to probate in 1906. In 1909 Ernest died, leaving a will, by which he devised all of his property to his wife, now Mary E. Sanders. Lucinda Woolley, the widow of William Woolley, died in 1913. No children were born to any of the children of said William Woolley. A previous will had been made by the testator, and this new will was apparently drawn because a son, Harvey, named as a beneficiary in the former will, had died about eight months before. The testimony tended to show that Lucinda Woolley for many years prior to her death was partially blind, and that the health of the daughter Gertrude was not good, she being considered an invalid by the other members of the family.

The principal question in this case is whether Ernest A. Woolley became the owner in fee simple of this real estate, subject only to the life estate of Lucinda Woolley, and to the payment, within five years after her death, of the bequests of $1000 to each of the three sisters. Counsel for appellee Mary E. Sanders contend that this is the proper construction to be given to the will, while counsel for appellants argue that Ernest A. Woolley only took a base or determinable fee in the land, which was liable to be de-

feated upon his death without issue at any time after the execution of the will, either before or after the death of his father.

The most important rule in the construction of wills, to which all others must bend, is that the intention of the testator, as expressed in his will, must prevail, provided it is consistent with the settled rules of law. (*Bradsby* v. *Wallace,* 202 Ill. 239; *Wardner* v. *Baptist Memorial Board,* 232 id. 606.) This intention is found by construing the words employed by the testator in the will itself in the light of his circumstances and surroundings. (*Strickland* v. *Strickland,* 271 Ill. 614, and cases cited.) While it is the intention, as shown in the will itself, that is to be sought, yet a court, in construing a will, is not bound to shut its eyes to the state of facts under which the document was made. "On the contrary, an investigation of such facts often materially aids in elucidating the scheme of disposition which occupied the mind of the testator. To this end it is obviously essential that the judicial expositor should place himself as fully as possible in the situation of the person whose language he has to interpret, and, guided by the light thus thrown on the testamentary scheme, he may find himself justified in departing from a strict construction of the testator's language without allowing 'conjectural interpretation to usurp the place of judicial exposition.'" (1 Jarman on Wills,—Sweet's 6th ed.—503.) "You may place yourself, so to speak, in his [testator's] arm-chair and consider the circumstances by which he was surrounded when he made his will, to assist you in arriving at his intention." (*Boyes* v. *Cook,* L. R. 14 Ch. Div. 1880, 53.) "The court is entitled to hear such extrinsic evidence of the surrounding circumstances as will put it in the place of the testator." (Page on Wills, sec. 817; see, also, 2 Underhill on Wills, sec. 909.) This court has said that in construing a will, evidence of the condition of the testator's mind at the time he executed it,—whether he lived with his family, the

state of his property and of his family,—was admissible. (*Wallace* v. *Foxwell,* 250 Ill. 616; *Strain* v. *Sweeny,* 163 id. 603; *Hawhe* v. *Chicago and Western Indiana Railroad Co.* 165 id. 561.) The court said in the last case (p. 564) : "The object of the evidence was to place before the court the circumstances attending the execution of the will in support of and in aid of the intention of the testator as declared in the will, and the court, in the exercise of its discretion, had the right to hear such evidence."

Counsel for appellants argue that the general plan and scope of the testator's will, as shown by the will itself, interpreted in the light of the surrounding circumstances, was to keep the real estate in question in his family. Practically all of the property owned by William Woolley when he died was real estate. He had $50 cash in the bank, $250 worth of chattel property and a $500 note signed by his son. Ernest A. Woolley never came into actual possession of the farm, as the mother, Lucinda, survived him and she was in actual possession up to the time of her death.

What did the testator mean by the seventh clause of the will? Did he intend that if any of his children died without issue at any time, either before or after his death, their respective share or shares should go to the surviving children, or did he mean that only in case a child died before he himself died should such child's share so "accrue" to the survivors? The words "die without definite issue," in said seventh clause, if considered by themselves alone, would be construed to mean death at any time, either before or after the death of the testator. (*Fifer* v. *Allen,* 228 Ill. 507; *Ahlfield* v. *Curtis,* 229 id. 139.) The context of a will, however, may show that this phrase was intended to mean that if the first taker die in the lifetime of the testator, without issue, then the second taker shall stand in his place to prevent a lapse. (*Spencer* v. *Spencer,* 268 Ill. 332, and cases cited.) Did the testator, by the use of the words immediately following "die without definite

issue," namely, "and before this will takes effect," in connection with the rest of the will, have reference only to children who should die without issue in his lifetime? The reference to when "this will takes effect," by itself, might readily be understood to mean at the death of the testator, for a will is ordinarily understood to take effect at the testator's death. These words, however, may also be construed as meaning the time when the property is to be distributed under the will after the life tenant's death. In order to obtain the correct meaning of any sentence, clause or phrase in a will it is fundamental that the entire will should be read and considered together. If the same words occur more than once in a will they are presumed always to be used in the same sense unless a contrary intention appears from the context. The intention to use the words in a different sense must be clear and beyond question. (*Rexford* v. *Bacon,* 195 Ill. 70; *Madison* v. *Larmon,* 170 id. 65; *Jenks* v. *Jackson,* 127 id. 341; Schouler on Wills,—3d ed.— sec. 471; 2 Jarman on Wills,—Bigelow's 6th ed.—chap. 69.) The eighth clause states that if the death of his wife "should occur prior to my death, then my will shall take effect and my estate divided, distributed and settled in the same manner as it would have been divided, distributed and settled if her death had occurred subsequent to" testator's decease. In the eighth clause it is evident that the testator used the words "take effect" as meaning the time of the division, distribution and settlement of the estate, and not as meaning the time of his death. That being the case, there is nothing in the context of the will, fairly construed, that would not be in entire harmony with giving the same meaning in the seventh clause as to when the will shall take effect. Indeed, reading the entire will together, that would seem to be the natural construction that would be put upon the expression "before this will takes effect," as used in said seventh clause.

There is another special context in the will that tends to support this conclusion. In the eighth clause it appears the testator knew that it was wise to provide what should be done in the event that his wife's death occurred before his own death. The same thing is clear as to the wording in the ninth clause, which provides what should be done "in the event her death occurs prior to mine." Had he intended by the seventh clause of the will that the words "any of my children herein named should die without definite issue" should mean die without definite issue before his own death he would have used some such definite phrase as he did in the other clauses of the will when he was referring to his own death.

There are certain circumstances connected with the making of this will which tend strongly to support the conclusion that he intended this property to remain in his family and not to go to strangers. When he made the will he was an old man over eighty-two years of age. Obviously he intended to have the clause "die without definite issue" apply to all his children alike. They were all grown, but compared with him they were all young. At the time the will was drawn Ernest was not married. The result of construing the words "die without definite issue" to mean die before the testator's death, as any layman could readily see, might be to cause this property to go to entire strangers in blood, as it would under the construction put upon the will by the decree of the trial court. The son died without "definite issue" and left all his property to his wife, who is now married again, and therefore such a construction sends the property to persons not of the blood of the testator, while the testator's children are still alive,—a result which he clearly would not have intended. In *Smith* v. *Bell,* 31 U. S. 168, under somewhat similar facts, Chief Justice Marshall said (p. 176): "All his feelings would prompt him to make, so far as was in his power, a comfortable provision for his wife during her life and for his child after

her decease. This he has attempted to do. No principle in our nature could prompt him to give his property to the future husband of his wife to the exclusion of his only child. Every consideration, then, suggested by the relation of the parties and the circumstances of the case comes in aid of that construction which would give effect to the last as well as the first clause in the will; which would support the bequest of the remainder to the son as well as the bequest to the wife. It is not possible to doubt that this was the intention of the testator." This court, in *Morrison* v. *Tyler*, 266 Ill. 308, quotes with approval from this same case the following (p. 319) : "The ties which connect the testator with his legatees, the affection subsisting between them, the motives which reasonably may be supposed to operate with him and to influence him in the disposition of his property, are all entitled to consideration in expounding doubtful words and ascertaining the meaning in which the testator used them." See, also, *Nixon* v. *Nixon,* 268 Ill. 524.

The testator was born in England. Even if the feeling that the oldest son should have the largest part of his property was implanted in him by tradition brought from the home of his birth, still, if that son died without issue, his natural desire must have been, as would be the natural desire of every parent, that his daughters should have this property rather than the relatives of his son by marriage. The record shows that the relation of the testator to his daughters had always been very friendly; that these relations existed at the time the will was executed. The oldest daughter was named as one of the executors of the will, clearly showing that he had confidence in her honesty and judgment. Considering the circumstances surrounding the testator at the time this will was made, the condition of his property and the motives which may reasonably be supposed to have influenced him in its disposition, how can we reasonably reach any other conclusion than that the testa-

tor intended to divide this property among his own children and their issue, after suitable provision for the widow? In so construing the will we are not obliged to insert any words in the will controlling or varying the intention of the testator, but are simply giving such a meaning to the actual words used as gives a reasonable effect and operation to all of its terms,—the meaning that was obviously intended by the testator. To do this it is only required that the court stand in testator's place and read the will in the light of the surroundings and circumstances under which it was written and executed. Under this will the son, Ernest A. Woolley, took only a base or determinable fee, and as at his death he left no issue his share therein terminated at that time, this share under the terms of the will going to his surviving sisters.

Considerable testimony is found in the record,—concerning the competency or admissibility of which there is a dispute,—referring to two wills being written by the testator, William Woolley, in his own handwriting after the execution of this will but which were never executed, and also as to the daughters helping to carry on the farm for years before his death. It is contended by counsel for Mary E. Sanders that none of this testimony was admissible. In the view we take of this case it is unnecessary for us to consider any of this testimony or to decide as to its admissibility. Neither is it necessary to decide as to the admissibility of Mrs. Abrahams' testimony concerning the occurrences and conversations at the time the will was executed.

The decree of the circuit court will be reversed and the cause remanded for further proceedings in harmony with the views herein stated.    *Reversed and remanded.*